## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HELENE AKONJI     )
           )
 Plaintiff       )
           )
  v.        )   Civil Action No. 05-cv-2101-JDB
           )
UNITY HEALTH CARE, INC.   )
           )
 Defendant      )
           )

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Unity Health Care, Inc. ("Defendant" or "Unity"), through its undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves this Court for an Order granting summary judgment in favor of Defendant and against Plaintiff Helene Akonji ("Plaintiff"). The grounds for this Motion are fully set forth in the accompanying Memorandum of Points and Authorities in Support hereof, with accompanying exhibits, incorporated herein by reference. Defendant's proposed Order is attached hereto. This Motion is based on all pleadings, papers and proceedings, heretofore and herein, as well as the submissions accompanying this Motion.

WHEREFORE, Defendant respectfully requests that its Motion for Summary Judgment be granted in its entirety; that the Plaintiff's Complaint be dismissed with prejudice; that Defendant be awarded its costs in this action; and that the Court grant Defendant such other and further relief as it may deem just and appropriate.

Respectfully submitted,
SCHNADER HARRISON SEGAL & LEWIS, LLP

_____

Benjamin W. Hahn (Bar No. 446270)
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, DC  20006-1825
Telephone:  (202) 419-4242
email:  bhahn@schnader.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2006, the foregoing Defendant's Motion for Summary Judgment was served via first class U.S. Mail, postage prepaid upon the following person:

*Plaintiff by counsel*

Bryan A. Chapman
601 Pennsylvania Ave, N.W.
Suite 900
Washington, DC 20004

*Attorney for Defendant*

Benjamin W. Hahn
SCHNADER HARRISON SEGAL & LEWIS

35617v1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HELENE AKONJI           ) | |
|              ) | |
|       Plaintiff        ) | |
|              ) | |
|         v.          )      Civil Action No. 05-cv-2101-JDB | |
|              ) | |
| UNITY HEALTH CARE, INC.   ) | |
|              ) | |
|      Defendant      ) | |

**DEFENDANT ALLEGANY COLLEGE'S MEMORANDUM IN**
**SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Unity Health Care, Inc. ("Defendant" or "Unity") has been sued by Plaintiff Helene Akonji for alleged violations of Title VII of the Civil Rights Act. Plaintiff's Complaint claims that Unity engaged in discrimination on the basis of gender and that she suffered retaliatory treatment while employed by Unity as a full-time pharmacist. Plaintiff is unable to show any disputed material fact to support her claim. Defendant seeks summary judgment.[1]

**PROCEDURAL HISTORY**

Plaintiff filed a complaint with the Equal Employment Opportunity Commission on April 9, 2004 ("EEOC") (Charge No. 100-2004-00484). (Exh. 2.) She received a Notice of Right to Sue letter on November 23, 2004, and filed a claim *pro se*, alleging a violation of the District of Columbia Human Rights Act. Subsequently, Plaintiff retained counsel and filed an amended

---

[1] Exhibits 3-17 are business records, as identified in the Declaration of Aaronissa Alleyne, Chief of Human Resources. (Exh. 1.)

complaint in the Superior Court of the District of Columbia, alleging a claim arising under

federal law. The case was then removed to this Court. Discovery is now complete, and the

matter is ripe for a dispositive motion.

## STATEMENT OF FACTS

Defendant Unity Health Care is a tax-exempt, non-profit health care provider that

operates a network of medical and social services in the District of Columbia. Unity has a written

non-discrimination policy, non-harassment policy, and formal grievance procedure, which all

employees must read and sign.

Plaintiff applied for the position of full-time staff pharmacist, and was interviewed by

Roderick Nwokorie, Director of Pharmacy Services. She was hired by Unity on February 6,

2002. Her continued employment was at-will and contingent upon "the successful completion of

a 90-day probationary period, ongoing performance assessments, and the availability of program

funding." (Exh. 3.) As outlined in the staff pharmacist job description, Unity reserved the right

to assign Plaintiff to different worksites as needed. (Exh. 4.)

While employed by Unity, Plaintiff was reassigned several times to fulfill the staffing

needs at Unity's seven pharmacies. Each pharmacy is located in the District of Columbia

("DC") metropolitan area, within a reasonable commuting distance of Plaintiff's residence.

Plaintiff's pay, benefits, job title, and duties were unaffected by these reassignments. Plaintiff

received the standardized annual increases awarded to all Unity staff pharmacists during her term

of employment. (Exh. 5.)

Because the facts of this case cannot be easily summarized in a chronological manner,

they are presented thematically.

**a. *Tardiness and Absenteeism.*** Plaintiff had repeated problems fulfilling her most rudimentary responsibilities, arriving late for work on numerous occasions or failing to appear at all. Although Unity attempted to accommodate Plaintiff by adjusting her work schedule four times between April and June of 2002, (Exh. 6), Plaintiff's irresponsible behavior persisted through out her employment. By failing to arrive at work on time, Plaintiff caused patients' prescriptions and refills to not be ready when the pharmacy opened "most of the time." (Exh. 7.) Plaintiff's irresponsibility and lack of professionalism threatened the health and safety of numerous patients with serious medical conditions. Because Plaintiff did not report to work reliably, drugs that patients urgently needed were not available as they should have been. *Id.*

Plaintiff was absent or tardy ten times during the 90-day probationary period when she began working for Defendant, despite the fact that probationary employees are not eligible for any leave. *Id.* Although Plaintiff was warned in writing about her deplorable attendance and placed on an extended 90-day probationary period as a sanction for her behavior, her chronic tardiness continued. In the fall and winter of 2002, Plaintiff reported to work late more than 40 percent of the time. (Exh. 8.) Mary Beth Levin, a Unity Clinic Manager, issued verbal and written reprimands for this unacceptable, unprofessional behavior and placed Plaintiff on "Restrictive Leave Status" in an effort to compel compliance by Plaintiff with her obligation to report to work in a consistent, timely manner. *Id.*

**b. *Error Rate.*** When Plaintiff actually appeared for work, she showed herself to be an irresponsible, dangerous employee who repeatedly compromised patients' health and safety. Plaintiff had a substantial rate of error, endangering people's lives by giving controlled drugs, which have a high risk of potential abuse or risk, to the wrong patients. Plaintiff thus could not account for drugs and did not keep the inventory required by her position. Shortly before her

termination, Libbie Buchele, a Unity Health Center Manager, detailed her trepidation about Plaintiff's work habits and stated that she was "very concerned about patient safety" due to the fact that "medication is being lost or wrongly dispensed." (Exh. 9.)

Plaintiff's mistakes and oversights were numerous and dangerous. Well-documented examples were observed by the pharmacist in charge of Unity's facility at DC General, Edward Ayanbiola. Ayanbiola reported that Plaintiff gave Tylenol #3, a controlled drug, to patients for whom it was not prescribed. (Exh. 6.) Plaintiff also filled a prescription for Xanax, a controlled drug, which she allowed to go stolen or missing; it could not be found or accounted for by the pharmacist on duty when the patient arrived to pick up his prescription. (Exh. 10.) On other occasions, Plaintiff dispensed an asthma medication to a non-asthmatic; mislabeled a prescription bottle so that a husband mistakenly ingested the medication prescribed to his wife; and lost multiple patients' prescriptions. (Exh. 9.)

c. *Extreme Carelessness.* In addition to the direct threat Plaintiff posed to Unity's patients, Plaintiff was otherwise careless in ways that negatively impacted Unity. Plaintiff mishandled controlled substances, allowing an unexplained "significant loss" (257 tablets) of Percocet to occur and nearly disposing of 100 tablets of Tylenol #3. (Exh. 10, 11.) Both of these controlled drugs must be handled with extreme care and are tightly controlled by federal authorities. They are so addictive and potentially dangerous that their loss must be reported to a Drug Enforcement Agency field office. Ayanbiola and Nwokorie both documented that Plaintiff did not recognize her responsibilities for these controlled drugs and repeatedly left bottles of Percocet unsecured in the pharmacy instead of placing them in the locked safe, as Unity procedure dictated. (Exh. 10.) After the Percocet under Plaintiff's supervision was reported

missing by another pharmacy employee, as required by law, Nwokorie contacted the proper
authorities to report the situation.  (Exh. 11.)

d. *Lost or Stolen Pharmacy Keys.*  On separate occasions, Plaintiff compromised the
safety and security of every controlled substance and drug within two of Unity's pharmacies by
mishandling the keys to those locations.  In May 2002, Plaintiff left a spare key to the Congress
Heights pharmacy in an unsecured area, which left that pharmacy susceptible to theft and
endangered the lives of those who came into contact with any drugs therein.  (Exh. 12.)  The key
was lost or stolen due to Plaintiff's flagrant disregard for her responsibilities.  Defendant was
then forced to change the keys to that pharmacy and install a new lock to protect the integrity of
its facility and medications as well as the health of its patients.

In spite of this extraordinarily careless and dangerous act, Plaintiff compromised the
security of another pharmacy location, the Upper Cardozo Health Center, the following year.  In
February 2003, Plaintiff refused to return her pharmacy key to Unity officials before leaving the
country.  Although she was specifically asked to return the keys for safekeeping, and contacted
several times to ensure security standards were not breached, Plaintiff once again increased the
risk that the pharmacy keys would fall into the wrong hands.  (Exh. 12.)  She received a written
reprimand for this careless, and potentially dangerous, act of insubordination from Jose Aponte,
Interim Director of Human Resources.  *Id.*

e. *Complaints to Human Resources.*  In an attempt to divert the blame for her severe
lapses in judgment and professional negligence, Plaintiff filed three complaints with Human
Resources.  These complaints centered around allegations that Nwokorie and other Unity
employees, including a female employee, were fabricating claims to make her look bad or were

themselves responsible for her severe negligence and irresponsibility. (Exh. 13, 14.) Plaintiff's allegations were addressed by Unity's Human Resources Department. (Exh. 15.)

One complaint, dated March 2003, alluded to an isolated incident in which Nwokorie allegedly attempted to kiss Plaintiff. (Exh. 14.) The complaint was generally about the discourteous treatment Plaintiff felt she was receiving and a feeble attempt to insinuate that the disciplinary action she had experienced was not warranted. *Id.* Plaintiff did not cite any other sexual harassment or physical contact in her complaints. This complaint was a diatribe against Nwokorie, primarily intended to dispute the validity of the legitimate disciplinary action that Unity had taken against Plaintiff. *Id.*

On January 7, 2004, Plaintiff addressed a detailed complaint to Barbara Hendricks, Director of Personnel, which did not allude to any sexual harassment. (Exh. 13.) Plaintiff alleged that Nwokorie limited her pharmacy's supply of medication, did not honor her requests for staff changes, and used a "bitter tone" when she repeatedly requested time off without notice. *Id.* Although Plaintiff protested that Nwokorie was creating a "hostile and stressful environment," her complaint did not include a single allegation of gender discrimination. *Id.* Like her other grievances, this complaint served as a feeble attempt by Plaintiff to deny responsibility for the dangerous behavior Defendant had investigated and cited Plaintiff for. Plaintiff conveniently produced these excuses the same day she was placed on administrative leave, an act undertaken by Human Resources to reevaluate Plaintiff's fitness as an employee and ensure that Plaintiff would not serve as a continued menace to Unity's patients.

**f. *Resulting Termination.*** After witnessing Plaintiff's repeated errors, Diana Lapp, a physician who worked with Plaintiff, and Libbie Buchele recommended that Defendant

terminate Plaintiff's employment. Human Resources placed Plaintiff on paid administrative leave so it could investigate her significant professional shortcomings. During the investigation, Human Resources reviewed Plaintiff's egregious behavior and recognized the serious liability and safety hazard that Plaintiff posed to Unity and its patients. Plaintiff's employment was terminated on February 2, 2004. The ultimate decision to do so was made by Barbara Hendricks, Director of Human Resources. Although Plaintiff's employment was at will, her termination was provoked by her repeated tardiness, absenteeism, dangerous errors, insubordination, failure to comply with Unity's policies, and inadequate leadership skills. (Exh. 16.) Throughout her tenure, Plaintiff risked the health and safety of patients by disregarding company policy, imperative health and safety standards, and federal law.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue about any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To defeat summary judgment, a non-moving party "must set forth specific facts that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once the moving party has carried its burden of showing an absence of evidence favoring the nonmovant, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the nonmovant fails to do that, the Court has "an affirmative obligation . . .to

prevent 'factually unsupported claims and defenses from proceeding to trial.'" *Catrett*, 477 U.S. at 323-324.

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49. "When a motion for summary judgment is made and supported as provided in [*Rule 56*], an adverse party may not rest upon the mere allegation or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [*Rule 56*] must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 252; *Shealy*, 929 F. 2d at 1012.

## ARGUMENT

**I.    Plaintiff's Claims of Gender Discrimination Based on Counts of Harassment are Time Barred.**

In addition to being without merit, any claims by Plaintiff of gender discrimination or sexual harassment are time-barred.[2] Under Title VII, a plaintiff needs to file her claim within 300 days of the last act of harassment. 42 U.S.C. § 2000e-5(e)(1). The last act of harassment alleged in Plaintiff's Complaint occurred on March 17 or 18, 2003. Plaintiff did not file a Charge of Discrimination with the EEOC until April 9, 2004. (Exh. 2.) Thus, Plaintiff's claim of gender discrimination must be rejected.

---

[2] Any claim Plaintiff maintains under the District of Columbia Human Rights Act is also time-barred. D.C. Code Ann. § 2-1403.04. Every alleged act of gender discrimination occurred more than one year before Plaintiff filed her Complaint.

## II.  Plaintiff Has Produced No Direct or Circumstantial Evidence That She Was Discriminated Against Based Upon Her Gender.

If the Court believes that Plaintiff's claims are not time-barred, then Plaintiff Akonji bears the burden of proving discrimination by the Defendant.  Under the burden shifting methodology set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), a plaintiff must adduce evidence sufficient to establish a prima facie case of discriminatory treatment.  If the plaintiff succeeds in doing so, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate non-discriminatory reason for discharging the plaintiff.  *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  If the defendant meets its burden of production, the presumption of discrimination created by the prima facie case is rebutted and "drops from the case," *Burdine,* 450 U.S. at 255 n. 10.  Plaintiff then bears the ultimate burden of projecting evidence sufficient to prove that the disciplinary action she experienced and her subsequent termination were the result of discriminatory treatment.  *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-11 (1993).

The Supreme Court clarified the plaintiff's burden at the pretext stage of a *McDonnell Douglas* analysis in *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000).  The Court reiterated that evidence of pretext, combined with the plaintiff's prima facie case, does not *compel* judgment for the plaintiff, because "it is not enough . . .to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination."  *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519 (1993)).  However, *Reeves* made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Id.*

There is no evidence that Plaintiff suffered adverse employment actions because of gender discrimination. A plaintiff does not shift the burden to the Defendant simply by stating she was fired or treated unfairly. *See McDonnell Douglas Corp.,* 411 U.S. 792. Defendant had a plethora of legitimate, non-discriminatory reasons for disciplining and ultimately terminating Plaintiff's employment: she was an extremely irresponsible, dangerous employee, and Defendant followed its standard disciplinary procedures in responding to Plaintiff's behavior. A reasonable jury could not conclude from all of the evidence that an adverse employment decision was made for a discriminatory reason. *Lathram v. Snow*, 336 F. 3d 1085, 1088 (D.C. Cir. 2003).

Neither has Plaintiff demonstrated a case of harassment cognizable under applicable federal law. The Supreme Court has clarified that Title VII sexual harassment may be based on either *quid pro quo* harassment, where "a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that reverse consequences flow from the employee's refusal" or "bothersome attentions or sexual remarks are sufficiently severe or pervasive….create a hostile environment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). Neither source of harassment is present in this case.

Plaintiff does not possess a valid Title VII sexual harassment claim, as the incidents she alludes to, even if taken to be true, do not constitute "bothersome attentions or sexual remarks that are sufficiently severe or pervasive [enough to]. . .create a hostile environment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). In order to establish a *prima facie* hostile work environment claim, Plaintiff must demonstrate that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; and (4) the harassment had the effect of unreasonably interfering with her work performance and

created an intimidating, hostile, or offensive working environment. *Davis v. Coastal Int'l Sec., Inc.*, 275 F. 3d 1119, 1122-23 (D.C. Cir. 2002).

Although Plaintiff is a member of a protected class, she was not subjected to unwelcome sexual overtures that were based on her sex. Plaintiff never alluded to the sexual overtures cited in her Complaint to Unity, despite the fact that she provided Defendant with three detailed accounts of her grievances during her term of employment. The singular sexual advance that Plaintiff described in her March 2003 complaint to Human Resources is an isolated incident, and is not actionable conduct under Title VII. *See Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 752 (1998) (Only harassing conduct that is "severe or pervasive" can produce a "constructive alteratio[n] in the terms or conditions of employment.")

Even if each act of harassment Plaintiff details in her Complaint were true, the facts she allege would not be sufficient to constitute legally proscribed sexual harassment. The Supreme Court has repeatedly ruled that sexual harassment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Faragher v. Boca Raton,* 524 U.S. 775, 786 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "The key terms, then, are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment. Under *Faragher*, in order to determine whether a work environment is sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance. 524 U.S. 775, 787-88." *Burton v. Batista,* 339 F. Supp. 97, 107 (D.C. Cir. 2004).

The acts of physical harassment Plaintiff cites in her Complaint occurred on two separate occasions, more than one year apart. In Plaintiff's deposition, she claimed that Nwokorie touched her or attempted to touch her on four occasions during her three-year tenure. (Exh. 17.) Isolated incidents do not amount to discrimination. *Id.* at 788. Unless "extremely serious" physical assault occurred, there is not hostile workplace sexual harassment. *Russ v. Van Scoyoc Associates,* 122 F. Supp. 2d 29, 33 (D.C.C. 2000).

In her deposition, Plaintiff describes isolated instances: one occasion where Nwokorie attempted to rub her leg for approximately four seconds and other occasions where Nwokorie tried to greet her in an overly friendly manner. (Exh. 17.) None of the alleged conduct was severe or physically threatening; indeed Nwokorie's alleged attempts to touch Plaintiff, if they occurred, were largely unsuccessful and resulted in no physical contact with Plaintiff. When Plaintiff rebuffed Nwokorie's overtures, he did not persist or attempt to overpower her. The incidents were isolated and minor, rather than severe, pervasive or abusive. Although if true, the cited incidents would be inappropriate workplace activity, Title VII is not a "general civility code" that is intended to closely monitor and sanction all inappropriate workplace interaction. *Faragher,* 524 U.S. at 788. The "temporally diffuse" nature of the conduct further suggests the lack of a condition sufficiently pervasive to constitute a hostile work environment. *See Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (holding that occurrence of alleged incidents intermittently over a seven-year period suggests the absence of a condition sufficiently "pervasive" to establish liability.)

Likewise, Plaintiff's claims fail to make out a case of *quid pro quo* sexual harassment. Such a claim could only succeed if Plaintiff could demonstrate that she received an actual adverse consequence as a result of Nwokorie's actions, which she did not. "It takes more than

saber rattling alone to impose *quid pro quo* liability on an employer; the supervisor must have wielded the authority entrusted to him to subject the victim to adverse job consequences as a result of her refusal to submit to unwelcome sexual advances." *Gary v. Long*, 59 F. 3d. 1391, 1396 (D.C. Cir. 1995). *See also Sauers v. Salt Lake County*, 1 F.3d 1122, 1127 (10th Cir. 1993) ("If the plaintiff can show that she suffered an economic injury from her supervisor's actions, the employer becomes strictly liable without any further showing of why the employer should be responsible for the supervisor's conduct.") (quoting *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992); *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 186 (6th Cir. 1992) ("The employee's refusal to submit to the supervisor's sexual demands [must have] resulted in a tangible job detriment.")

Plaintiff did not experience any adverse job consequences as a result of Nwokorie's alleged harassment.  In this case, Plaintiff did not suffer any economic detriment, and in fact, received standard pay increases through out her term of employment. (Exh. 5.)  Plaintiff was moved to different pharmacy locations, based on Defendant's staffing needs. (Exh. 1.)  Doing so did not subject Plaintiff to any changes in the terms or conditions of her position and was an expressly reserved term of her employment. (Exh. 4.)  "An employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Keeley v. Small*, 391 F. Supp. 2d. 30, 42 (D.D.C. 2005)(quoting *Walker v. Washington Metro. Area Transit Auth.*, 102 F. Supp. 2d. 24, 29 (D.D.C. 2000).  Although Plaintiff now expresses displeasure about her reassignments, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

The assistant position Plaintiff alludes to in her Complaint and claims that Nwokorie promised, and never gave her, does not qualify as a valid claim. There is no evidence that the position Plaintiff alludes to was ever created or filled, nor was it formally offered to her outside of Nwokorie's alleged comments. *See Keeley*, 391 F. Supp. 2d. at 44. Unity has no record of anyone becoming Nwokorie's assistant, or such a position being created. Therefore, Plaintiff cannot show that Defendant's failure to "promote" her to this position is pretextual. *Stella v. Mineta*, 284 F. 3d. 135, 145 (D.C. Cir. 2002). Any adverse employment actions Plaintiff experienced were the direct result of her substandard job performance, as outlined in the Statement of Facts. She was reprimanded, and eventually fired – and not at Nwokorie's behest, but upon the recommendation of other, female Unity employees – because of the well-documented shortcomings Plaintiff had as a Unity employee.

Finally, Plaintiff's claim is missing an "essential element" of sexual harassment. "It is of course well settled that it is an essential element of a sexual harassment claim, *inter alia,* that the employer failed to take appropriate action in response to a report of such activity." *Tatum v. Hyatt Corp.*, 918 F. Supp. 5 (D.D.C. 1994). An employer may defend against a showing of hostile work environment by demonstrating that there was no hostile work environment, or that (1) the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. *Farragher v. Boca Raton*, 524 U.S. 775, 807, 141 L. Ed. 2d 662, 118 S. Ct. 2275.

Defendant had an established grievance procedure and anti-discrimination policies, of which Plaintiff was aware (Exh. 18.) Plaintiff did not bring charges of gender discrimination that she now alleges in her Complaint despite initiating three claims with Human Resources,

which is clearly unreasonable. Human Resources responded to Plaintiff's reported concerns and cannot be charged with responsibility for additional grievances that Plaintiff explicitly chose not to disclose. Defendant cannot now be held responsible when Plaintiff failed to notify them of the alleged incidents she now cites in her Complaint. There were no witnesses to these alleged incidents. Thus, Defendant would not have known about these isolated incidents unless Plaintiff took full advantage of the grievance procedure, as she did not hesitate to do three times during her tenure. Plaintiff's claims are also not actionable for this reason. *See id.*

### III. Plaintiff Has Produced No Direct or Circumstantial Evidence That Her Termination and the Disciplinary Action She Experienced Were the Result of Retaliation.

For Plaintiff to prove that she was retaliated against, she must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) the adverse employment action was caused by the protected activity. *See, e.g., Jones v. Washington Metropolitan Area Transit Authority*, 205 F.3d 428, 433 (D.C. Cir. 2000). Plaintiff's complaint fails to establish the link between her protected activity and the adverse employment action she experienced. Plaintiff experienced adverse employment actions because she endangered patient health and safety, was insubordinate, and had a deplorable attendance record.

The first element of a retaliation claim is present. Plaintiff engaged in protected activity by reporting Nwokorie's allegedly discriminatory behavior to Human Resources in 2003 and 2004.

In order to meet the second element of this claim, Plaintiff must demonstrate that she suffered a tangible, adverse employment action. The reassignments she recounts in her complaint were not adverse employment actions. *See e.g., Burlington Industries, Inc. v. Ellerth,*

524 U.S. 742, 761 (1998) ("[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). These reassignments, which were a term of her employment detailed in her job description, simply changed the place to which Plaintiff reported for work but in no way changed her job duties, pay, benefits or any other terms or conditions of her employment.

"Changes in assignments or work-related duties do not ordinarily constitute adverse employment actions if 'unaccompanied by a decrease in salary or work hour changes.' *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556-57 (D.C. Cir. 1997). 'Not everything that makes an employee unhappy is an actionable adverse action.' *Ball State Univ.*, 89 F.3d at 441. Purely subjective injuries, such as dissatisfaction with reassignment, public humiliation or loss of reputation, or unhappiness over assigned duties are not adverse actions. *See Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002). Rather, there must be a significant change in job responsibilities." *Lester v. Natsios*, 290 F. Supp. 2d 11, 38 (D.D.C. 2003).

Furthermore, even if the neutral reassignments Plaintiff experienced could be considered tangible employment actions, as "undesirable reassignments," they were undertaken for legitimate, non-discriminatory reasons. *See Brown v. Brody*, 199 F. 3d 446, 457 (D.C. Cir. 1999). Unity had a difficult time fulfilling its available staff pharmacist positions during Plaintiff's term of employment, while expanding its operations and opening new facilities. (Exh. 1.) Plaintiff, as well as other pharmacists, were reassigned as needed to ensure that pharmacies were adequately staffed and fully operable. Id.

With regard to the adverse employment actions Plaintiff allegedly suffered, her deplorable employment history at Unity readily explains every incident that occurred during her

tenure. After being continually tardy or absent from work, Plaintiff was placed on an extended 90-day probationary term. (Exh. 7.) Although Defendant considered terminating Plaintiff's employment for cause at this point, Defendant gave her a second chance because finding a replacement was extremely difficult at that time. When Plaintiff's poor attendance record continued, a fact that is well-recorded by several sources, Defendant responded by placing her on Restricted Leave Status. (Exh. 8.)

The written reprimand Plaintiff received from Jose Aponte, Interim Director of Human Resources, was the result of two serious acts of insubordination: one which compromised the security of a Unity pharmacy, and another that resulted in the breach of company policy and the law through her failure to safeguard a tightly controlled drug. (Exh. 12.) These serious breaches of company policy not only threatened the integrity of Defendant's operation, but posed a danger to the public. This adverse employment act clearly the result of Plaintiff's behavior and was issued for wholly non-discriminatory reasons.

The culmination of these adverse employment actions was Plaintiff's administrative leave status, and ultimate termination. Given her blemished employment history at Unity, Human Resources decided to place Plaintiff on administrative leave and conduct an investigation to determine whether her employment should be terminated. This action was precipitated by Libbie Buchele, a Unity Health Center Manager, who elucidated her concern about Plaintiff's work habits and was "very concerned about patient safety" due to the fact that "medication is being lost or wrongly dispensed." (Exh. 9.) Unity carefully considered the extensive evidence that showed Plaintiff to be an unfit, dangerous employee before it took these final two measures. (Exh.16.)

In order to prevail on her claim of retaliatory termination, Plaintiff must demonstrate that there is a causal connection between her refusal to acquiesce to Nwokorie's alleged sexual advances and the adverse employment actions she experienced. In this case, Plaintiff has failed to marshal any evidence to support her contention that Defendant's actions were retaliatory. Plaintiff repeatedly failed to adhere to Defendant's employment standards and endangered the health and safety of numerous patients. Plaintiff's job performance was unsatisfactory and dangerous, which is certainly good cause for termination. *See Stoeckel v. Environmental Management Systems, Inc.* 882 F. Supp. 1106 (D.D.C. 1995). Just as the plaintiff in *Stoeckel*, Plaintiff cannot dispute the fact that she performed poorly and was on notice that her superiors were concerned about, and dissatisfied with, her job performance.

After a pervasive history of absenteeism, tardiness, negligence and insubordination, Plaintiff "earned her discharge [as well as the other adverse employment actions] the old fashioned way." *Williams v. Verizon Washington, DC, Inc.*, 266 F. Supp. 2d 107, 120 (D.C.C. 2003). Her employment record reflects numerous incidents that warrant her termination, and the administrative leave she was placed on just prior to her termination. She was more than a poor employee; she was a threat. Unity acted not only lawfully, but responsibly, in terminating her employment.

Furthermore, Plaintiff's claim must fail because the alleged source of her sexual harassment claims was not the person who decided to terminate Plaintiff's employment. *Hall v. Giant Food* held that a supervisor's discriminatory remarks could not be considered evidence of discrimination because the decision to dismiss the employee was made not by the supervisor, but by the company's Director of Transportation. 175 F. 3d 1074 (D.C. Cir. 1999). Likewise, in this case, both the recommendation and ultimate decision to terminate Plaintiff's employment were

made by people other than the alleged harasser.  While Nwokorie was one of the people who supervised Plaintiff, as was the case in *Hall*, he did not retain the authority to terminate her employment and initiate or finalize the process to do so.  *See id.*

## CONCLUSION

For the foregoing reasons, there is no genuine dispute as to any material fact arising out of the circumstances pleaded in the Complaint of Plaintiff Helene Akonji, and her claims of gender discrimination fail as a matter of law.  Therefore, Defendant Unity Health Care respectfully requests that this Court dismiss the Complaint, with prejudice, and with costs to Defendant.

Respectfully submitted,

SCHNADER HARRISON SEGAL & LEWIS, LLP

Benjamin W. Hahn (Bar No. 446270)
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, DC  20006-1825
Telephone:  (202) 419-4242
email:  bhahn@schnader.com