Page 27

1  thinking --

2              MR. HAHN:  You want to make it a
3  separate exhibit?

4              MR. CHAPMAN:  Yes.

5              MR. HAHN:  Well, it's already
6  in.

7              MR. CHAPMAN:  In that case we
8  can work with that.  That's part of that package.

9  BY MR. CHAPMAN:

10     Q    Can you take a look at that particular
11  exhibit. and can you read where it says -- after it
12  say:  Dear Mr. Nwokorie.  Can you read what that
13  says, that first sentence?

14     A    This is a notice of final decision in
15  follow up to a proposal --

16     Q    Could you read it so that the court
17  reporter --

18     A    This is a notice of final decision that
19  I had received to issue a written reprimand to
20  you -- a reprimand to you for inappropriate conduct
21  towards your subordinates.

22     Q    Would you agree now, looking at this

Page 28

1  document, that it was a written reprimand?

2      A    It says here.  But I'm not sure -- I'm
3  not sure whether I received this in the first place
4  because what I receive was from Michelle Madison,
5  the only letter I have is from Michelle Madison on
6  this.

7      Q    Okay.  **So have you seen this letter**
8  **before?**

9      A    No.

10     Q    **Why don't you take the time and read the**
11 **entire thing.  It's from Exhibit -- what's that**
12 **bundle?**

13                MR. HAHN:  Exhibit 3.

14                MR. CHAPMAN:  Pages 116 to 117.
15 What we have here is a letter to Roderick Nwokorie,
16 from --

17                MR. HAHN:  Dr. Antoine Smith.

18                MR. CHAPMAN:  And he is director
19 of human resources, Unity Healthcare.

20                THE WITNESS:  Yes.  I see it as
21 a reprimand, and it says here -- as I told you, if I
22 got this letter to me, I probably responded to it

1  because I had the opportunity to respond to it.

2  They afford me the opportunity, and I know I can

3  respond to it.

4  BY MR. CHAPMAN:

5        Q    And essentially what it says is that:

6  The requirements are that you refrain from

7  communication with employees that can be construed

8  as threatening, inappropriate, or intimidating, and

9  secondly it says you attend a management training

10 course.

11       A    Mm-hmm.

12       Q    Say yes?  You can say yes-

13       A    Yes.

14       Q    Okay.  And it says here that:  Based on

15 the foregoing, it has been determined that you

16 receive this written reprimand that will become

17 part of your official personnel file for two years.

18            Is that accurate?

19       A    Okay.

20       Q    Is that what you read?

21       A    That's what I read here now.  But then

22 I'm going to tell you that I had a discussion after

Page 30

1 this whole event with my immediate supervisor,

2 Michelle Madison.  She told me she was going to

3 recommend that I go for training, which I did.  I

4 never got this letter because in the first place,

5 if I am accused of anything, which was the issue I

6 had with Antoine Smith and his group who

7 investigated this, was that if I am accused of

8 anything, I have the liberty to know what I'm

9 accused of.

10          Nobody gave me anything that I'm accused

11 of, even in language, except what we discussed in

12 the meeting, that they say I'm unfair -- for all

13 those things that we discuss in the meeting,

14 including that I was unfair, I was showing

15 favoritism, that I was talking to them in an

16 unprofessional manner.  That was -- those were the

17 only things I knew they accused me of.

18          I never had any other letter or any

19 documentation showing me all the accusations

20 against me.

21     Q    So to the best of your knowledge. Unity

22 took no official disciplinary action against you in

Page 31

1 regard to those complaints?

2    A   No. If this is a reprimand they have in
3 the -- in the office, I mean in the file, I would
4 take it as an action, but nobody told me. The only
5 one I knew that could have, you know, become is
6 that they recommended that I went for a training,
7 which I did.

8    Q   So to the best of your knowledge, what
9 you are saying you know you had not seen that
10 document before?

11    A   No, I have not seen it.

12    Q   And to the best of your knowledge, no
13 disciplinary action was taken against --

14    A   You are right.

15    Q   -- other than going to training?

16    A   Yes.

17          MR. CHAPMAN: Okay. The stack
18 that we had before that I provided, is that Exhibit
19 No. 1?

20          MR. HAHN: That's two.

21          MR. CHAPMAN: Two. What I would
22 like to do is go to Exhibit No. 2. And I would

1  like to go to Dr. Akonji's second complaint.

2            MR. HAHN:  Okay.

3  BY MR. CHAPMAN:

4       Q   Mr. Nwokorie, you heard that second
5  complaint discussed today; is that correct?

6       A   I heard it.

7       Q   If we go to Page No. 3 of that second
8  complaint, there is that second paragraph and the
9  line that was discussed that said -- Dr. Akonji
10 basically in her complaint is saying that you said
11 to her:  I just want to see how you're doing and
12 see your beautiful face.  And when he will try to
13 kiss me and I will withdraw from him, reacting, he
14 will say, just give me a hug.  It's just a hug.  It
15 will not hurt you.

16           You heard that today?

17      A   I heard that today and I read it now.

18      Q   And you see that's part of a written
19 complaint that Dr. Akonji submitted to several
20 members, I guess, of the staff, the administrative
21 staff of Unity on March 19th, 2003 or around that
22 time?

Page 33

1           MR. HAHN:  Objection.

2 BY MR. CHAPMAN:

3       Q    You heard this complaint discussed
4 today?

5       A    Yeah.

6       Q    And you have had a chance to read it?

7       A    Not in the full entirety.  You know, I
8 just read this, because I haven't seen it before.
9 Nobody gave it to me.

10      Q    You heard what I read --

11      A    Yeah.

12      Q    --as being part of the complaint,
13 allegations that you attempted to hug her and kiss
14 her and, you know, when she resisted you said it's
15 just a hug, it's not going to hurt.

16           Did anyone ever approach you in terms of
17 anyone from human resources or any other
18 department, related department at Unity, anyone
19 ever approach you with these allegation from
20 Dr. Akonji?

21      A    Emphatically no.

22      Q    Did anyone ever tell you that Dr. Akonji

1  had complained about sexual harassment or basically
2  accused you of sexually harassing her?
3     A    No.
4              MR. HAHN:  Objection.
5  BY MR. CHAPMAN:
6     Q    During the time when you were talking
7  about the complaints, I believe they're from
8  employees, one's named Brenda, I think Pamela, and
9  what was the third?
10    A    Denise Butler.
11    Q    Denise Butler, that complaint that led
12 to the reprimand.
13         Was a complaint from Dr. Akonji ever
14 mentioned at that time?
15    A    No.
16    Q    So what you are saying is you never
17 heard of a complaint of any kind relating to sexual
18 harassment, kissing, hugging, touching of the
19 buttocks, or any other kind of physical contact or
20 any words of advances?  No one ever approached you,
21 say, from human resources or any other department
22 about allegations from Dr. Akonji?

1    A    No.

2    Q    Okay.  In February or March of 2004, do you ever recall having drugs that were in the clinic where Dr. Akonji worked, do you ever recall ordering that drugs be removed from the shelves?

6    A    Yes, and if I may explain.  We -- we manage our inventory through drug order and through what we call par level, that is, the amount of drugs you keep in the pharmacy at all times based on utilization records.  And each pharmacy center has a par level to order -- to put their orders on.

12        And it happened that the agency that supplied the drug to us, or the stakeholder for our operation of our pharmacy went into Akonji's pharmacy and saw excessive amount of drugs.  Most of them were not fast movers.  They were so much beyond what she should keep there.  Then they called me and told me they have such amount of drug there.  And that amounted to a lot of money.

20        So what I did was to ask a technician to remove excess drugs and leave the amount based on utilization.  And I instructed her, please, before

1 you order drugs again, let me know.  And then to

2 make sure you order based on what you use.  I did

3 that.

4      Q     Do you recall at that time there ever

5 being a shortage of drugs at the clinic where

6 Dr. Akonji was employed?

7      A     Yes.  Then thereafter, several weeks

8 after she stopped ordering the normal things she

9 should order because she was angry that we came

10 there to remove the drug.  And Helen Akonji never

11 admits any fault.  She thinks she is right in

12 everything.  She will argue with you in everything

13 she does. And I am a manager.  I tell her, give

14 her instructions based on standard, and what I know

15 is good for the organization.  She will argue.  She

16 argued and was angry and fought against the staff

17 who was removing the drug.

18          In order to retaliate in the subsequent

19 weeks, she failed to order those most important

20 drugs that we need to keep these patients going,

21 something like high blood pressure medicines, blood

22 sugar medicines, cholesterol medicines.  They were

1  in shortage.  Doctors were angry, the nurses were

2  angry, and then I found out that she purposely

3  had -- the staff told me she would never order

4  again because I removed drugs from her and the fact

5  she was punishing patients.

6       Q    Let me ask you.  You said in this

7  particular situation you ordered drugs removed

8  because of a surplus at that particular location.

9            How many times in the past have you done

10 that?

11      A    Never done it, except that -- I haven't

12 done it before.  But this particular instance, the

13 stakeholders, those who give us drugs came there to

14 inspect the stock and found that she had more drugs

15 than the warehouse stock, which to me looked bad on

16 me and the organization.  Because it was

17 departmental health, DC departmental health that

18 supplies us with drugs.

19      Q    Let me ask you, was that situation

20 discovered at any other clinic?

21      A    No, nobody else did it.  They don't do

22 it-

Page 38

1  Q    And what were your instructions to
2 Dr. Akonji in light of removing those drugs?  I
3 mean how -- what specifically did you say would be
4 the process for getting drugs returned, I mean in
5 case they were needed?
6            MR. HAHN:  Objection.
7            MR. CHAPMAN:  Go ahead.
8            THE WITNESS:  My assertion to
9 her was to make sure she ordered drugs based on her
10 utilization.  And that way you keep down from
11 overstocking or understocking, but she wasn't doing
12 that.
13            And let me tell you again why she wasn't
14 doing it.  Because Akonji failed to do -- perform
15 her major responsibilities.  She is in charge of
16 ordering drugs.  She could ask a pharmacy
17 technician to put the order on the book, but Akonji
18 was responsible for making sure that the quantity
19 ordered matched the quantity she needed.  But she
20 would ask them to -- order it, and this staff, the
21 subordinate staff would order maybe an excess
22 amount, and they continue ordering the same thing

1 every week, like 24 bottles.  We went there and

2 found a particular drug had 48 bottle of 100 each,

3 a particular drug.

4          And I mean that was bringing down the

5 whole operation, completely.

6 BY MR. CHAPMAN:

7      Q    Were some of the drugs ever returned

8 that you removed?

9      A    No.

10              MR. HAHN:  Objection.

11              THE WITNESS:  We kept them in

12 the pharmacy and redistributed them.  And I

13 instructed her when I was remove them to continue

14 to order from DC General pharmacy whenever she

15 needed them.

16              MR. CHAPMAN:  I would like to

17 take about a few minutes.

18              MR. HAHN:  Do you want this room

19 because we can go to my office?

20              MR. CHAPMAN:  We can step out in

21 the hallway.  It might be a matter of a minute or

22 two.  I just want to follow up on a few things.

```
                                                              Page 40
 1        (Thereupon, a recess was taken.)

 2                    MR. CHAPMAN:  We will resume.

 3   BY MR. CHAPMAN:

 4        Q    Mr. Nwokorie, you testified earlier that

 5   you were never approached by anyone from human

 6   resources or anyone related to human resources

 7   about a complaint of sexual harassment from

 8   Dr. Akonji.  Is that your testimony?

 9        A    Yes.

10        Q    Were you approached by anyone from human

11   resources or a related department about any

12   complaint of any kind from Dr. Akonji, relating to

13   intimidation or threats or anything of any kind?

14        A    The -- the COO, Mr. Aponte, and I had a

15   meeting after Akonji wrote a series of allegations

16   against me and then he met with me.  He came to --

17   in fact, they he met with the center manager of

18   Congress Heights and some other individuals, he

19   interviewed so many other people, and finally he

20   met with me and told me that Akonji kept -- you

21   know, accused me of harassing her, sending her from

22   place to place, never mentioned sexual harassment.
```