IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HELENE AKONJI ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 05-cv-2101-JDB |
| ) | |
| UNITY HEALTH CARE, INC. ) | |
| ) | |
| Defendant ) | |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS[1]**

Defendant Unity Health Care is a tax-exempt, non-profit health care provider that operates a network of medical and social services in the District of Columbia. Unity has a written non-discrimination policy, non-harassment policy, and formal grievance procedure, which all employees must read and sign.

Plaintiff applied for the position of full-time staff pharmacist, and was interviewed by Roderick Nwokorie, Director of Pharmacy Services. She was hired by Unity on February 6, 2002. Her continued employment was at-will and contingent upon "the successful completion of a 90-day probationary period, ongoing performance assessments, and the availability of program

---

[1] Please note that Defendant inadvertently failed to include this Statement of Undisputed Material Facts with its Motion for Summary Judgment. Defendant has taken the contents of this document, in its entirety, from Defendant's Memorandum in Support of its Motion for Summary Judgment. All references to Exhibits herein refer to Exhibits to Defendant's Memorandum. Counsel for Plaintiff has consented to this admission and waived his right to respond further, as Counsel for Plaintiff has already responded to these facts in his Opposition.

funding." (Exh. 3.) As outlined in the staff pharmacist job description, Unity reserved the right to assign Plaintiff to different worksites as needed. (Exh. 4.)

While employed by Unity, Plaintiff was reassigned several times to fulfill the staffing needs at Unity's seven pharmacies. Each pharmacy is located in the District of Columbia ("DC") metropolitan area, within a reasonable commuting distance of Plaintiff's residence. Plaintiff's pay, benefits, job title, and duties were unaffected by these reassignments. Plaintiff received the standardized annual increases awarded to all Unity staff pharmacists during her term of employment. (Exh. 5.)

Because the facts of this case cannot be easily summarized in a chronological manner, they are presented thematically.

**a.** *Tardiness and Absenteeism.* Plaintiff had repeated problems fulfilling her most rudimentary responsibilities, arriving late for work on numerous occasions or failing to appear at all. Although Unity attempted to accommodate Plaintiff by adjusting her work schedule four times between April and June of 2002, (Exh. 6), Plaintiff's irresponsible behavior persisted through out her employment. By failing to arrive at work on time, Plaintiff caused patients' prescriptions and refills to not be ready when the pharmacy opened "most of the time." (Exh. 7.) Plaintiff's irresponsibility and lack of professionalism threatened the health and safety of numerous patients with serious medical conditions. Because Plaintiff did not report to work reliably, drugs that patients urgently needed were not available as they should have been. *Id.*

Plaintiff was absent or tardy ten times during the 90-day probationary period when she began working for Defendant, despite the fact that probationary employees are not eligible for any leave. *Id.* Although Plaintiff was warned in writing about her deplorable attendance and

2

placed on an extended 90-day probationary period as a sanction for her behavior, her chronic tardiness continued. In the fall and winter of 2002, Plaintiff reported to work late more than 40 percent of the time. (Exh. 8.) Mary Beth Levin, a Unity Clinic Manager, issued verbal and written reprimands for this unacceptable, unprofessional behavior and placed Plaintiff on "Restrictive Leave Status" in an effort to compel compliance by Plaintiff with her obligation to report to work in a consistent, timely manner. *Id.*

**b.** *Error Rate.* When Plaintiff actually appeared for work, she showed herself to be an irresponsible, dangerous employee who repeatedly compromised patients' health and safety. Plaintiff had a substantial rate of error, endangering people's lives by giving controlled drugs, which have a high risk of potential abuse or risk, to the wrong patients. Plaintiff thus could not account for drugs and did not keep the inventory required by her position. Shortly before her termination, Libbie Buchele, a Unity Health Center Manager, detailed her trepidation about Plaintiff's work habits and stated that she was "very concerned about patient safety" due to the fact that "medication is being lost or wrongly dispensed." (Exh. 9.)

Plaintiff's mistakes and oversights were numerous and dangerous. Well-documented examples were observed by the pharmacist in charge of Unity's facility at DC General, Edward Ayanbiola. Ayanbiola reported that Plaintiff gave Tylenol #3, a controlled drug, to patients for whom it was not prescribed. (Exh. 6.) Plaintiff also filled a prescription for Xanax, a controlled drug, which she allowed to go stolen or missing; it could not be found or accounted for by the pharmacist on duty when the patient arrived to pick up his prescription. (Exh. 10.) On other occasions, Plaintiff dispensed an asthma medication to a non-asthmatic; mislabeled a prescription bottle so that a husband mistakenly ingested the medication prescribed to his wife; and lost multiple patients' prescriptions. (Exh. 9.)

**c. *Extreme Carelessness.*** In addition to the direct threat Plaintiff posed to Unity's patients, Plaintiff was otherwise careless in ways that negatively impacted Unity. Plaintiff mishandled controlled substances, allowing an unexplained "significant loss" (257 tablets) of Percocet to occur and nearly disposing of 100 tablets of Tylenol #3. (Exh. 10, 11.) Both of these controlled drugs must be handled with extreme care and are tightly controlled by federal authorities. They are so addictive and potentially dangerous that their loss must be reported to a Drug Enforcement Agency field office. Ayanbiola and Nwokorie both documented that Plaintiff did not recognize her responsibilities for these controlled drugs and repeatedly left bottles of Percocet unsecured in the pharmacy instead of placing them in the locked safe, as Unity procedure dictated. (Exh. 10.) After the Percocet under Plaintiff's supervision was reported missing by another pharmacy employee, as required by law, Nwokorie contacted the proper authorities to report the situation. (Exh. 11.)

**d. *Lost or Stolen Pharmacy Keys.*** On separate occasions, Plaintiff compromised the safety and security of every controlled substance and drug within two of Unity's pharmacies by mishandling the keys to those locations. In May 2002, Plaintiff left a spare key to the Congress Heights pharmacy in an unsecured area, which left that pharmacy susceptible to theft and endangered the lives of those who came into contact with any drugs therein. (Exh. 12.) The key was lost or stolen due to Plaintiff's flagrant disregard for her responsibilities. Defendant was then forced to change the keys to that pharmacy and install a new lock to protect the integrity of its facility and medications as well as the health of its patients.

In spite of this extraordinarily careless and dangerous act, Plaintiff compromised the security of another pharmacy location, the Upper Cardozo Health Center, the following year. In February 2003, Plaintiff refused to return her pharmacy key to Unity officials before leaving the

country. Although she was specifically asked to return the keys for safekeeping, and contacted several times to ensure security standards were not breached, Plaintiff once again increased the risk that the pharmacy keys would fall into the wrong hands. (Exh. 12.) She received a written reprimand for this careless, and potentially dangerous, act of insubordination from Jose Aponte, Interim Director of Human Resources. *Id.*

  e. ***Complaints to Human Resources.*** In an attempt to divert the blame for her severe lapses in judgment and professional negligence, Plaintiff filed three complaints with Human Resources. These complaints centered around allegations that Nwokorie and other Unity employees, including a female employee, were fabricating claims to make her look bad or were themselves responsible for her severe negligence and irresponsibility. (Exh. 13, 14.) Plaintiff's allegations were addressed by Unity's Human Resources Department. (Exh. 15.)

  One complaint, dated March 2003, alluded to an isolated incident in which Nwokorie allegedly attempted to kiss Plaintiff. (Exh. 14.) The complaint was generally about the discourteous treatment Plaintiff felt she was receiving and a feeble attempt to insinuate that the disciplinary action she had experienced was not warranted. *Id.* Plaintiff did not cite any other sexual harassment or physical contact in her complaints. This complaint was a diatribe against Nwokorie, primarily intended to dispute the validity of the legitimate disciplinary action that Unity had taken against Plaintiff. *Id.*

  On January 7, 2004, Plaintiff addressed a detailed complaint to Barbara Hendricks, Director of Personnel, which did not allude to any sexual harassment. (Exh. 13.) Plaintiff alleged that Nwokorie limited her pharmacy's supply of medication, did not honor her requests for staff changes, and used a "bitter tone" when she repeatedly requested time off without notice.

*Id.* Although Plaintiff protested that Nwokorie was creating a "hostile and stressful environment," her complaint did not include a single allegation of gender discrimination. *Id.* Like her other grievances, this complaint served as a feeble attempt by Plaintiff to deny responsibility for the dangerous behavior Defendant had investigated and cited Plaintiff for. Plaintiff conveniently produced these excuses the same day she was placed on administrative leave, an act undertaken by Human Resources to reevaluate Plaintiff's fitness as an employee and ensure that Plaintiff would not serve as a continued menace to Unity's patients.

**f. *Resulting Termination.*** After witnessing Plaintiff's repeated errors, Diana Lapp, a physician who worked with Plaintiff, and Libbie Buchele recommended that Defendant terminate Plaintiff's employment. Human Resources placed Plaintiff on paid administrative leave so it could investigate her significant professional shortcomings. During the investigation, Human Resources reviewed Plaintiff's egregious behavior and recognized the serious liability and safety hazard that Plaintiff posed to Unity and its patients. Plaintiff's employment was terminated on February 2, 2004. The ultimate decision to do so was made by Barbara Hendricks, Director of Human Resources. Although Plaintiff's employment was at will, her termination was provoked by her repeated tardiness, absenteeism, dangerous errors, insubordination, failure to comply with Unity's policies, and inadequate leadership skills. (Exh. 16.) Throughout her tenure, Plaintiff risked the health and safety of patients by disregarding company policy, imperative health and safety standards, and federal law.