## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HELENE AKONJI,**

    **Plaintiff,**

      **v.**

**UNITY HEALTHCARE, INC.,**

    **Defendant.**

**Civil Action No. 05-2101 (JDB)**

## MEMORANDUM OPINION

Plaintiff Helene Akonji ("Akonji" or "plaintiff") brings this employment-discrimination suit against defendant Unity Healthcare, Inc. ("Unity" or "defendant") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 (2001). Akonji alleges that her male supervisor sexually harassed her on various occasions, that she was fired in retaliation for complaining of the harassment, and that she was subjected to a hostile work environment. Currently pending before the Court is defendant Unity's motion for summary judgment. For the reasons set forth below, the Court concludes that some of plaintiff's claims are untimely, that plaintiff has failed to rebut defendant's legitimate, non-discriminatory reason for firing her, and that the isolated incidents of alleged harassment do not amount to a hostile work environment. Unity's motion for summary judgment will therefore be granted.

## BACKGROUND

Defendant Unity is a tax-exempt, non-profit health care provider that operates a network of medical and social services in the District of Columbia. Def.'s Stmt. of Undisputed Material

1

Facts ("Def.'s Stmt.") at 1.[1]  Akonji, a licensed pharmacist, was hired by Unity as a staff

pharmacist on February 6, 2002.  Def.'s Mem. in Support of Mot. for Summ. J. ("Def.'s Mem."),

Exh. 3 (5/5/02 letter).  Roderick Nwokorie ("Nwokorie"), the Director of Pharmacy Services for

Unity, was named Akonji's immediate supervisor.  Id.  Akonji was initially placed at Unity's

Anacostia pharmacy, while Nwokorie worked at the D.C. General pharmacy.  This assignment

did not, however, purport to be permanent, since Akonji's job description indicated that she

would be reassigned "temporarily or permanently depending on overall need."  Def.'s Exh. 4 (Job

Description).  Under Unity's policy, Akonji's continued employment depended on her successful

completion of a 90-day probationary period.  Def.'s Exh. 3.

　　　For the first five or six weeks of her employment, Akonji allegedly did not receive a

paycheck.  Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n."), Exh. 1 (Akonji Dep.) at 44.

Akonji alleges that she called Nwokorie on three occasions after she did not receive her pay

check on a scheduled pay day.  Id. at 22, 42-44.  Each time she called, Nwokorie would visit

Akonji on her lunch break at the Anacostia clinic and offer her cash to help her pay her bills until

her first paycheck arrived.  Id. at 51.  Akonji alleges that during those visits, Nwokorie hugged

her, grabbed her buttocks, and attempted to kiss her.  Id.  On each occasion, there were no

---

[1] Both parties have failed to comply with the local rules governing submission of
statements of material facts in support of, or in opposition to, a motion for summary judgment.
See Local Civ. R. 7(h), 56.1.  Unity provided a statement of material facts, but did so only after
Akonji had submitted her opposition.  Its statement, moreover, is a verbatim reproduction of the
background section of its motion, is organized "thematically," and is filled with heated rhetoric.
Although Akonji has offered her own version of the facts in her opposition to defendant's motion,
she has failed to file, as the rules require, "a separate concise statement . . . setting forth all
material facts as to which it is contended there exists a genuine issue necessary to be litigated."
Local Civ. R. 7(h).  Hence, the Court has extracted the factual chronology from the exhibits
submitted by both parties as well as from their respective memoranda.

witnesses to the interaction between Akonji and Nwokorie.  Id.  Akonji claims to have resisted

Nwokorie's alleged advances, but she did accept $500 from him on his third visit.  Id. at 79.

On April 8, 2002, Akonji was reassigned to the D.C. General clinic to fulfill a staffing

need.  In early May 2002, while Akonji was working at the D.C. General pharmacy, Nwokorie

again allegedly attempted to hug and kiss Akonji as she was exiting her car in the clinic's parking

lot.  Pl.'s Exh. 1 at 62.  Akonji points to two other incidents that occurred during the same month.

On one occasion, Nwokorie asked her if she would like to travel to a meeting with him.  Id. at 65.

Akonji refused.  Id.  Nwokorie would also allegedly stare at Akonji and often ask her, "Why don't

we eat together?" when she was preparing to take her lunch break.  Id. at 78-79.

On May 20, 2002, Akonji had her first performance evaluation, which was conducted by

Nwokorie.  Pl.'s Exh. 4 (5/20/02 Performance Appraisal).  Nwokorie's evaluation stated that

Akonji "had good clinical skills," but that she had to show "responsibility, dependability and

interest in her job."  Id.  That same day, Akonji received a memorandum from Nwokorie

detailing eleven occasions on which she had been either tardy or absent and informing her that

such continued behavior could result in her dismissal before the end of the probationary period.

Pl.'s Exh. 5 (5/20/02 Memo.).  As a result of Akonji's poor attendance record, Nwokorie

recommended an additional 90-day probationary period for her.  Pl.'s Exh. 6 (5/24/02 Memo.).

Other irregular events transpired while Akonji was working at the D.C. General

pharmacy.  The authorities had to be notified when 257 tablets of Percocet, a controlled drug,

went missing.  Def.'s Exh. 10 (6/14/02 Memo.).  Later, on June 10, 2002, Edward Ayanbiola, one

of Akonji's fellow pharmacists, sent a letter to Michelle Madison, a Project Director at Unity,

complaining about the verbal and physical abuse that he had suffered at the hands of Akonji.

Def.'s Exh. 6 (6/10/02 Complaint Letter).  Akonji was transferred to the Congress Heights

pharmacy shortly thereafter.  Def.'s Exh. 14 (12/10/02 and 3/19/03 Complaint Letters).  Then on

December 2, 2002, Akonji received a follow-up memorandum detailing 29 additional instances

of tardiness or absences since September 2002.  Def.'s Exh. 8 (12/2/02 Memo.).

On December 10, 2002, Akonji filed a complaint about her repeated transfers among

pharmacies and about the pharmacy manager at Congress Heights, with whom she did not have a

good relationship.  Def.'s Exh. 14.  Akonji was transferred to the Upper Cardozo pharmacy less

than a week later.  Id.  While at that location, Akonji received a written reprimand for

insubordination.  Def.'s Exh. 12 (3/13/03 Written Reprimand).  The reprimand cited two causes,

the first being Akonji's continued disregard for instructions from her supervisors regarding how

to handle the keys to the pharmacy, and the second her disregard of Unity's policy of keeping an

inventory of certain controlled drugs.  Id.  These infractions resulted in Akonji being placed on

probation through June 13, 2003.  Id.  Akonji was again transferred on March 17, 2003, this time

to the Walker Jones pharmacy.  Def.'s Exh. 14.

On March 19, 2003, Akonji filed a complaint with Unity's Chief Executive Officer, Vince

Kean, alleging that Nwokorie had discriminated against her and sexually harassed her.  Id.

Akonji received confirmation in a letter from the Interim Director for Human Resources that her

complaint had been received and that an investigation had been conducted.  Def.'s Exh. 15

(4/8/03 Letter).  However, Nwokorie claims that he was never contacted with regard to the

investigation of Akonji's complaints.  Pl.'s Exh. 3 (Nwokorie Dep.) at 33-34.

Nwokorie conducted Akonji's second annual performance evaluation on July 9, 2003.

Pl.'s Exh. 10 (7/9/03 Performance Evaluation).  The evaluation stated that while Akonji had

4

made "some marked improvements," she still needed to improve regarding "attendance and punctuality" and her "use of sound judgment in operational issues." Id. Akonji alleges that during the evaluation Nwokorie placed his hand on her thigh for several seconds. Pl.'s Exh. 1 at 70-75.

Five months later, while working at the Walker Jones pharmacy, Akonji gave the wrong medication to a patient and was subsequently reprimanded by Unity. Def.'s Exh. 9 (12/9/03 E-mail). Then, on December 23 and 24, 2003, Nwokorie ordered the removal of certain drugs from the Walker Jones pharmacy that were determined to be overstocked. Def.'s Exh. 13 (1/7/04 Complaint Letter). This prompted Akonji to file another complaint against Nwokorie on January 7, 2004, which Unity's Director of Personnel received on February 1, 2004. Id. The complaint alleged that Nwokorie had behaved inappropriately in removing the drugs from Akonji's pharmacy, which resulted in shortages of medication, and also in dealing with Akonji's requests for emergency time-off. Id. Finally, on February 6, 2004, Akonji was terminated by Unity. Def.'s Exh. 16 (2/6/04 Termination Letter). Akonji proceeded to file a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 9, 2004 (4/9/04 EEOC Charge of Discrimination). Pl.'s Exh. 12.

Akonji received her right to sue letter on November 23, 2004. Acting pro se, she filed her original one-count complaint in District of Columbia Superior Court on February 18, 2005. Dkt. #1 (Notice of Removal) ¶ 9. She later filed an amended complaint in Superior Court on September 30, 2005. Although Akonji's amended complaint did not articulate specific theories of liability, it did allege that Unity had violated Title VII and the D.C. Human Rights Act (DCHRA). The parties' subsequent filings clarify that the complaint asserts three theories of

5

liability: quid pro quo sexual harassment, retaliation for complaining of that harassment, and discrimination based on a hostile work environment. Unity removed the case to this Court and proceeded to file its motion for summary judgment on October 13, 2006. In its supporting memorandum, Unity makes three primary arguments: 1) Akonji's claims of gender discrimination based on specific incidents of sexual harassment are time-barred; 2) Akonji has failed to produce any direct or circumstantial evidence to support her claim of gender discrimination; and 3) Akonji has failed to produce any direct or circumstantial evidence that her termination was the result of retaliation. Unity's summary judgment motion is now ripe for resolution.

## <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Id.</u> (quoting Fed. R. Civ. P. 56(c))).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. <u>See</u> <u>Anderson v. Liberty Lobby,</u> <u>Inc.</u>, 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the

"mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to

the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

(citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence

on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for

an employer . . . to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

national origin."  42 U.S.C. § 2000e-2(a)(1).  The language of Title VII "is not limited to

'economic' or 'tangible' discrimination"; rather, "the phrase 'terms, conditions, or privileges of

employment' evinces a congressional intent to 'strike at the entire spectrum of disparate treatment

of men and women' in employment."  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64

(1986) (quoting Los Angeles Dep.'t of Water & Power v. Manhart, 435 U.S. 702, 707 n. 13

(1978)).  Similarly, the goal of the DCHRA is to "secure an end . . . to discrimination for any

reason . . ., including, but not limited to, discrimination by reason of race, color, religion, national

origin, [and] sex . . . ."  D.C. Code § 2-1401.01 (2001).  The DCHRA specifically prohibits firing

or otherwise "discriminat[ing] against any individual, with respect to [her] compensation, terms,

conditions, or privileges of employment."  Id. § 2-1402.11(a)(1).

Akonji makes three claims arising from the alleged sexual harassment she suffered at the

hands of her supervisor, Nwokorie, and, in turn, Unity.  Those claims are for discrete acts of quid

7

pro quo sexual harassment, that she was fired in retaliation for filing complaints, and that she was subjected to a hostile work environment.  See Am. Compl. at 1-2.  Before turning to the merits of these claims, however, the Court must first address defendant's contention that plaintiff's suit is barred by the applicable statutes of limitations.

**A. Timeliness**

Both Title VII and the D.C. Human Rights Act have strict limitations periods.  Under Title VII, a plaintiff must file an employment discrimination charge with the EEOC either 180 or 300 days after an "alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1). The 300-day window applies when the aggrieved person first filed a complaint with a state or local agency with the authority to grant relief or to institute criminal proceedings.  See id. Although Akonji did not file with a state or local agency first, employees are entitled to the 300-day window when a "worksharing agreement" exists between the EEOC and a local fair employment practices office.  29 C.F.R. § 1601.13(a)(4)(ii)(A); see Carter v. George Washington University, 387 F.3d 872, 879 (D.C. Cir. 2004).  Such an agreement exists between the District of Columbia Office of Human Rights and the EEOC.  See Carter, 387 F.3d at 879.  Hence, Akonji was required to file a complaint with the EEOC within 300 days of the occurrence of the alleged unlawful employment practice.  She filed her complaint with the EEOC on April 9, 2004; based on that date, the 300-day window stretches back to June 15, 2003.

Application of the 300-day time frame turns on the type of claim Akonji is making.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) (distinguishing between claims for discrete acts of discrimination and hostile-work-environment claims).  The Court in Morgan held that discrete retaliatory or discriminatory acts "occur" when those acts take place, and that

8

an aggrieved party "must file a charge within . . . 300 days of the date of the act or lose the ability to recover for it." <u>Id.</u> at 110. This rule applies to two of the three types of Title VII claims that Akonji alleges in her complaint: discrete acts of sexual harassment and retaliatory discharge. <u>See id.</u> Akonji alleges that Nwokorie tried to hug and kiss her and touched her buttocks on three occasions when he visited her at the Anacostia clinic at the end of February and in early March 2002. Akonji's April 9, 2004 complaint was filed with the EEOC more than 300 days after these alleged discrete acts of discrimination. Akonji's claim that Nwokorie hugged her and tried to kiss her while she was working at the D.C. General clinic in May 2002 likewise occurred outside of the 300-day time limit. The July 9, 2003 incident in which Nwokorie allegedly rubbed Akonji's thigh during her performance evaluation, however, falls within the 300-day time limit. Accordingly, all of Akonji's claims arising from discrete acts of sexual harassment, except for the July 9, 2003 incident, are time-barred.

The timeliness of Akonji's retaliation claim must be examined separately. Unity undoubtedly subjected Akonji to an adverse employment action when it fired her on February 6, 2004. <u>See Cones v. Shalala</u>, 199 F.3d 512, 521 (D.C. Cir. 2000) (stating that "'no particular type of personnel action [is] automatically excluded from serving as the basis for a cause of action' under Title VII, as long as the plaintiff is 'aggrieved' by the action") (quoting <u>Brown v. Brody</u>, 199 F.3d 446, 455 (D.C. Cir. 1999) (alteration in <u>Cones</u>)). This event occurred well within 300 days of Akonji's filing of her complaint with the EEOC on April 9, 2004. Her retaliation claim is therefore timely. <u>See Morgan</u>, 536 U.S. at 114 (stating that "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" that must fall within the appropriate time frame, either 180 or 300 days).

9

The timeliness of Akonji's hostile-work-environment claim must be assessed differently because under Morgan a hostile-work-environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at 117. A claim of hostile work environment, the Supreme Court has explained, cannot be reduced to a single action on a single day because "[its] very nature involves repeated conduct," and it is based on the "cumulative effect of individual acts." Id. at 115. The unlawful employment practice at issue in a hostile-work-environment claim occurs over a period of time, and, "[p]rovided that an act contributing to the claim occur[red] within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117. Accordingly, this Court's task is to "determine whether the acts about which [Akonji] complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Id. at 120.

The Court answers both of these inquiries in the affirmative. In so doing, it relies again on Morgan. There, the Supreme Court accepted the Ninth Circuit's finding that the acts complained of "involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers," and held that the acts both outside and within the limitations period were part of the same actionable hostile-work-environment claim. Id. (citation and quotation marks omitted); see also Chaple v. Johnson, 453 F. Supp. 2d 63, 74 (D.D.C. 2006) ("[A] plaintiff must demonstrate that the alleged events leading to the hostile work environment were connected . . . ."). Similarly, the five acts of sexual harassment alleged by Akonji were all of the same nature and were all committed by "the same manager[]" - - Nwokorie. This includes the July 9, 2003 incident that falls within the 300-day statutory period. Between the alleged acts

of sexual harassment in early 2002 and the final act in July 2003, Akonji also alleges that Nwokorie made remarks that she deemed inappropriate regarding her appearance and the possibility of taking weekend trips together. These actions, taken together, constitute a single claim that Unity subjected Akonji to a hostile work environment. In sum, because the July 9, 2003 incident occurred within the 300-day time period and was part of a single "actionable hostile work environment practice," Akonji's hostile-work-environment claim under Title VII is timely.

Under the D.C. Human Rights Act, an employee must file a private cause of action against an employer "in a court of competent jurisdiction within one year of the unlawful discriminatory act, or the discovery thereof." D.C. Code § 2-1403.16 (2001). Acting pro se, Akonji filed her original one-count complaint in Superior Court on February 18, 2005. Dkt. #1 (Notice of Removal) ¶ 9. As indicated above, Akonji bases her claim of quid pro quo sexual harassment on discrete acts that occurred in 2002. Those acts are well outside of the one-year DCHRA limitations period. The July 2003 incident, which she uses to establish her hostile-work-environment claim, likewise took place more than a year before she filed her original complaint in February 2005. Accordingly, Akonji's claims of quid pro quo sexual harassment and hostile-work-environment discrimination under the DCHRA are time-barred.

Akonji's retaliation claim under the DCHRA presents a closer question. The retaliatory discharge, which is the latest discriminatory action that Akonji allegedly suffered, occurred on February 6, 2004. As mentioned above, Akonji filed her original complaint on February 18, 2005, twelve days after the one-year deadline. The only way that the claim could be timely is if Akonji is entitled to statutory tolling. District of Columbia law provides that the filing of a

complaint with the D.C. Office of Human Rights "toll[s] the running of the statute of limitations while the complaint is pending." D.C. Code § 2-1403.16. That statutory section does not, however, make any mention of an analogous tolling principle that applies when a plaintiff lodges a complaint not with the D.C. Office of Human Rights, but with the EEOC.[2] The Court has found no authority extending the tolling provision of § 2-1403.16 in such a manner. If that section's one-year statute of limitations and narrow tolling provision are enforced according to their terms, then Akonji's DCHRA retaliation claim was filed twelve days late and is untimely. But the Court need not definitively resolve the timeliness question because, as the following discussion demonstrates, defendant is entitled to summary judgment on the retaliation claim even if that claim is deemed to have been timely filed. Cf. Colbert v. Potter, 471 F.3d 158, 168 (D.C. Cir. 2006) (explaining that even if the district court committed a procedural error in deciding summary judgment motion, that error was harmless because the "nonmoving party could not have produced any evidence sufficient to create a substantial question of fact material to the governing issues of the case" (citation and quotation marks omitted)).

**B. Disparate Treatment**

A claim of gender-based discrimination "with respect to the terms and conditions of employment can be based on a supervisor's demands for sexual favors." Burton v. Batista, 339 F. Supp. 2d 97, 109 (D.D.C. 2004) (citing Burlington Indus. v. Ellerth, 524 U.S. 742, 752-54

---

[2] The tolling provision was added as part of legislation that codified the one-year statute of limitations for filing DCHRA claims and also established a mandatory mediation process. See 1997 District of Columbia Laws 12-39 (Act 12-143). Prior to the passage of that legislation, the D.C. Court of Appeals had held that the filing of a complaint with the D.C. Office of Human Rights did not toll the limitations period. See Anderson v. United States Safe Deposit Co., 552 A.2d 859, 863 (D.C. 1989); see also Weiss v. Int'l Bhd. of Elec. Workers, 729 F. Supp. 144, 146 (D.D.C. 1990).

(1998)).  "'The gravamen of a quid pro quo claim is that a tangible job benefit or privilege is

conditioned on an employee's submission to sexual black-mail and that adverse consequences

follow from the employee's refusal.'"  Gary v. Long, 59 F.3d 1391, 1395 (D.C. Cir. 1995)

(quoting Carrero v. New York City Housing Auth., 890 F.2d 569, 579 (2d Cir. 1989)).  A

plaintiff claiming unlawful quid pro quo sexual harassment under Title VII may, absent direct

evidence, prove her case under the burden-shifting framework established in  McDonnell-

Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework, a plaintiff must first

establish the five elements of a prima facie case of quid pro quo sexual harassment:  (1) that she

was a member of a protected class; (2) that she was subject to unwelcome sexual advances or

requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the

employee's submission to unwelcome advances was an express or implied condition for receiving

job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted

in adverse job consequences; and (5) that respondeat superior liability exists.  Stone-Clark v.

Blackhawk, Inc., 460 F. Supp. 2d 91, 95 (D.D.C. 2006).   If a plaintiff establishes a prima facie

case of quid pro quo sexual harassment, the burden then shifts to the defendant to provide a

legitimate, non-discriminatory reason for the adverse action.  McDonnell Douglas, 411 U.S. at

802.  If the defendant successfully provides such a reason for the adverse employment action, the

"McDonnell Douglas framework disappears," and the question becomes "whether a reasonable

jury could infer intentional discrimination from '(1) the plaintiff's prima facie case; (2) any

evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and

(3) any further evidence of discrimination that may be available to the plaintiff.'"  Murray v.

Gilmore, 406 F.3d 708, 713 (D.C. Cir. 2005) (quoting Waterhouse v. District of Columbia, 298

F.3d 989, 992-93 (D.C. Cir. 2002)).

Akonji's prima facie case for quid pro quo discrimination based on the July 9, 2003 "touching" incident fails at the fourth step. She has not provided any evidence that her submission to Nwokorie's sexual advance on July 9, 2003, was an "express or implied condition for receiving job benefits," or that her rejection of Nwokorie's sexual advance "resulted in an adverse job consequence." See Stone-Clark, 460 F. Supp. 2d at 95. There is no indication in the record that Nwokorie threatened Akonji with adverse employment actions if she did not submit to his sexual advance on July 9, 2003, and Akonji was ultimately terminated almost seven months later by Unity's Director of Personnel, who is a woman. Def.'s Exh. 16; see Gary, 59 F.3d at 1396 (finding that because a supervisor did not carry out the threats made, the employee could not make out a claim for quid pro quo sexual harassment). Because she has failed to establish her prima facie case, Akonji's claim of discrimination based on quid pro quo sexual harassment fails. Unity's motion for summary judgment will therefore be granted on this claim.

## C. Retaliation

Title VII and the D.C. Human Rights Act prohibit retaliation against an employee who "opposed any . . . unlawful employment practice," or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to the unlawful employment practice of the employer. 42 U.S.C. § 2000e-3(a); D.C. Code § 2-1402.61(b) (2001). As with a claim for discrimination based on quid pro quo sexual harassment, a plaintiff claiming unlawful retaliation under Title VII or the DCHRA may also, absent direct evidence,

prove her case under the McDonnell-Douglas burden-shifting framework.[3]  Under this framework, a plaintiff must first establish the three elements of a prima facie case of retaliation: (1) that she engaged in a protected activity; (2) that she was subjected to an adverse action by her employer; and (3) that a causal link existed between the adverse employment action and the protected activity.  See Broderick v. Donaldson, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006).

Akonji has successfully established the elements of a prima facie case of retaliation.  She engaged in a protected activity when she sent her complaint letter regarding Nwokorie to the Director of Personnel at Unity in early 2004.[4]  See Broderick, 437 F.3d at 1232 (stating that "[w]hile no 'magic words' are required," in order to be considered a protected activity a complaint must allege unlawful discrimination in some way).  Akonji has also satisfied the second prong of a prima facie case because she was subjected to an adverse employment action when she was terminated by Unity on February 6, 2004.  Pl.'s Exh. 11 (2/6/04 Termination Letter); see Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

---

[3] The D.C. Court of Appeals generally applies the McDonnell-Douglas burden-shifting framework and other interpretations of federal anti-discrimination laws to claims brought under the DCHRA.  See Carpenter v. Fed. Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) ("In interpreting its Human Rights Act the District of Columbia also follows [the McDonnell-Douglas] formula, . . ., and generally seems ready to accept the federal constructions of Title VII, given the substantial similarity between it and the D.C. Human Rights Act.").

[4] This element of Akonji's prima facie case need not be addressed in detail because Unity has conceded for purposes of this motion that Akonji engaged in a protected activity under 42 U.S.C. § 2000e-3(a) when she sent her complaint letter on February 1, 2004.  Def.'s Mem. at 18.

Finally, the third requirement of a prima facie case, causation, can be met by showing that the employer had knowledge of the employee's protected activity and that the adverse personnel action took place shortly after the activity.  See Singletary v. District of Columbia, 351 F.3d 519, 525 (D.C. Cir. 2003) ("[T]his circuit has held that a close temporal relationship may alone establish the required causal connection.").  Akonji's complaint was received by Barbara Hendricks, the Director of Personnel for Unity, on February 1, 2004.  Def.'s Exh. 13.  Five days later, on February 6, 2004, Akonji was terminated.  Def.'s Exh. 16.  Because only five days passed between the receipt of Akonji's complaint and her subsequent termination, Akonji has established the required causal link.  See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (per curiam) (citing with approval cases holding that "the temporal proximity" between protected conduct and the adverse employment action "must be 'very close'"); Singletary, 351 F.3d at 525 (determining that one month between the protected activity and the adverse action might suffice to establish a causal connection); see also Mayers v. Laborers' Health & Safety Fund of North America, 478 F.3d 364, 369 (D.C. Cir. 2007) (finding an eight-month gap between the protected activity and the adverse employment action too long to infer causation).

Because Akonji has established a prima facie case of retaliation, the burden shifts to Unity to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  Unity's reason is the straightforward explanation that Akonji was fired for repeatedly violating company policy and practices.  Insubordination and violation of company rules are widely accepted non-discriminatory reasons for termination.  See Edwards v. U.S. Envtl. Protection Agency, 456 F. Supp. 2d 72, 94 (D.D.C. 2006) (collecting cases); see also Valles-Hall v. Center for Nonprofit Advancement, - - F. Supp. 2d - - , 2007 WL 779385, at *24

(D.D.C. Mar. 12, 2007) (recognizing poor treatment of co-workers and insubordination as legitimate, non-discriminatory reasons for employer's actions).  Moreover, Unity supports this justification with ample documentary evidence.  See Def.'s Exhs. 6-12.  These documents reveal that Akonji treated her fellow employees poorly, that she was frequently tardy or absent, that she made numerous mistakes when filling prescriptions, and that there were multiple occasions when Akonji disregarded Unity's procedures and policies.  One example of Akonji's insubordinate behavior was her refusal to keep specific medications in a safe in the pharmacy, which resulted in a loss of a particular medication that had to be reported to the local police and the Drug Enforcement Agency.  Def.'s Exhs. 10, 11 (6/18/02 Memo).  Akonji also disregarded Unity procedures governing the handling of keys to the pharmacies, on one occasion failing to follow instructions to leave the key to the pharmacy with an another employee before she left on a vacation, and a second time losing a key that resulted in the need to change the locks to the pharmacy.  Def.'s Exh. 12.  Akonji does not grapple with this evidence, either in a statement of genuine issues or in her opposition memorandum.  This uncontradicted evidence of Akonji's insubordinate behavior and failure to follow company procedures satisfies Unity's burden of providing a legitimate, non-discriminatory reason for terminating Akonji.  See Williams v. Verizon Washington, DC, Inc., 266 F. Supp. 2d 107, 120 (D.D.C. 2003) (stating that the employee "earned her discharge the good old fashioned way" in concluding that her frequent absences and tardiness were a legitimate, non-discriminatory reason for her employer to terminate her).

     Finally, because Unity has provided a legitimate, non-discriminatory reason for terminating Akonji's employment, Akonji must now show that Unity's reasons are a pretext for

retaliation. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000). The question becomes "whether a reasonable jury could infer intentional discrimination from '(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff.'" <u>Murray</u>, 406 F.3d at 713 (quoting <u>Waterhouse</u>, 298 F.3d at 992-93). Akonji does not come close to making the requisite showing. Indeed, she has not offered any evidence at all to overcome Unity's justifications for her termination. Although Akonji attempts to explain why she was late on two occasions, <u>see</u> Def.'s Exh. 13 (referring to her sick mother and problems with the bank), this modest effort does not undermine the contemporaneous accounts of her weaknesses as an employee or suggest that anything other than those weaknesses were the cause of her termination. The record - - unrebutted by Akonji - - reflects numerous shortcomings by Akonji, several of them serious failings by a pharmacist, that ultimately led Unity (through several female officials, and not Nwokorie) to terminate her. No evidence exists linking that well-documented employment decision to gender-based discrimination. In short, Akonji has not offered any evidence from which a reasonable juror could conclude that Unity's proffered reasons are a mere pretext for discrimination. <u>See Smith v. District of Columbia</u>, 430 F.3d 450, 455-56 (D.C. Cir. 2005) (concluding that a reasonable jury could not find the defendant's reasons for its actions were pretextual because "the [defendant's] non-discriminatory justifications for its actions remain[ed] completely unrebutted"). Because Akonji has failed to rebut Unity's proffered explanation for her termination, summary judgment is warranted on her retaliation claim.

**D. Hostile Work Environment**

      In addition to her claim of retaliation, Akonji also claims a violation of Title VII and the

DCHRA based on a hostile work environment. A "hostile" work environment rises to the level

of unlawful discrimination when the workplace "is permeated with 'discriminatory intimidation,

ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" Harris v. Forklift Systems, Inc., 510

U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).

To make out a prima facie case for a Title VII gender-based hostile-work-environment claim, the

plaintiff-employee must show: "(1) the employee was a member of a protected class; (2) the

employee was subjected to unwelcome[ ] sexual harassment . . .; (3) the harassment complained

of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably

interfering with the plaintiff's work performance and creating an intimidating, hostile, or

offensive working environment . . .; and (5) the existence of respondeat superior liability." Davis

v. Coastal International Security, Inc., 275 F.3d 1119, 1123 (D.C. Cir. 2002) (citation and

quotation marks omitted). As a woman, Akonji is a member of a protected class, and she claims

that she was subjected to unwelcome sexual harassment, thus satisfying the first two elements of

a prima facie claim for hostile work environment. The alleged sexual harassment was committed

by Nwokorie, a man, against Akonji, a woman, thus allowing the Court to infer that the third

element of a prima facie case is satisfied. See id. (stating that when "'the challenged conduct . . .

involves explicit or implicit proposals of sexual activity'" between members of the opposite sex,

"'it is reasonable to assume those proposals would not have been made to someone of the same

sex'") (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). A question

remains, however, with respect to the fourth factor and the determination of whether the alleged

sexual harassment was so "severe or pervasive" that it "alter[ed] the conditions of [Akonji's]

19

employment and create[d] an abusive working environment." Harris, 510 U.S. at 21 (citation and quotation marks omitted).

In order for a hostile work setting to be actionable, the environment must be both objectively and subjectively hostile, which means that a reasonable person would find the environment hostile or abusive and that the victim perceived it to be so. See Faragher v. Boca Raton, 524 U.S. 775, 787 (1998). The totality of the circumstances must be examined in making this determination. Harris, 510 U.S. at 23. Although no single factor is determinative, these circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. The Supreme Court has stated that "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788; see Harris, 510 U.S. at 21 (declaring that the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment") (quoting Meritor, 477 U.S. at 67); Carrero, 890 F.2d at 577 ("The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.") (cited in Faragher, 524 U.S. at 787 n.1); Gilbert v. City of Little Rock, 722 F.2d 1390, 1394 (8th Cir. 1983) ("More then a few isolated incidents of harassment must have occurred to establish a violation of Title VII.").

In advancing her hostile-work-environment claim, Akonji points to a number of instances of alleged sexual harassment between February 2002 and July 2003. The first incident allegedly occurred at the Anacostia pharmacy in late February and early March 2002, when Nwokorie

hugged Akonji, touched her buttocks, and tried to kiss her.  Pl.'s Exh. 1 at 24, 42-47.  Akonji also

relies on a similar occurrence in the parking lot at the D.C. General pharmacy in May 2002, when

Nwokorie tried to hug and kiss her as she exited her car.  Id. at 62.  The final discrete act of

sexual harassment that Akonji points to occurred over a year later, when Nwokorie allegedly

touched Akonji's thigh during her performance review on July 9, 2003.  Id. at 66-70.  In addition

to the acts of sexual harassment that involved physical contact, Akonji alleges that while she was

working for Unity in a temporary capacity, Nwokorie told her on one occasion that she "was a

beautiful, attractive, intelligent and hard working lady he would like to work with."  Pl.'s Exh. 7

(3/19/03 Complaint letter).  She further alleges that Nwokorie would "frequently" stop at the

Anacostia clinic during her break, stating that he "just wanted to see how [Ankonji was] doing,

and to see [her] beautiful face."  Id.  Finally, Akonji maintains that while she was working at the

D.C. General pharmacy, Nwokorie asked her to accompany him on a weekend trip on one

occasion and that Nwokorie would often stare at her and ask her "why don't we eat together?"

when Akonji was preparing to take her lunch break.  Pl.'s Exh. 1 at 65.

  These acts of alleged harassment, although by no means ideal workplace conduct, are not

"sufficiently severe or pervasive to alter the conditions of [Akonji's] employment and create an

abusive working environment."  Harris, 510 U.S. at 21 (citation and quotation marks omitted).

Title VII, the Supreme Court has explained, is not intended to be a "general civility code" in the

workplace; rather, "it forbids only behavior so objectively offensive as to alter the 'conditions' of

the victim's employment."  Oncale, 523 U.S. at 80-81.  The alleged instances of sexual

harassment, comprised of five discrete acts over the two-year period as well as infrequent

inappropriate comments and staring, do not reach the level of "severe" or "extremely serious"

conduct that is required by the Supreme Court to state a claim for hostile-work-environment discrimination. Federal courts have found that similar conduct, including offensive comments, staring, and unwanted touching, did not meet the standard of severe and pervasive conduct as articulated by the Supreme Court. See, e.g., Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir. 1999) (concluding that "boorish and offensive" comments, combined with "several incidents that involved staring and unwanted touching between the elbow and shoulder," was not severe in relation to a hostile-work-environment claim); Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998) (determining that teasing, ambiguous comments, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched the plaintiff's fingers, arm, or buttocks did not amount to a hostile work environment); Carter v. Greenspan, 304 F. Supp. 2d 14, 25 (D.D.C. 2004) (concluding that an employee's allegations that the employer "'caressed [him] on his knee,' 'placed her breast on [his] arm,' and 'placed his fingers on her buttocks'" were not "sufficiently severe in quantity or quality" to create a hostile work environment) (alteration in original); see also Curry v. District of Columbia, 195 F.3d 654, 662 (D.C. Cir. 1999) (separate opinion of Henderson, J.) (citing the Shepherd and Adusumilli decisions with approval).

Furthermore, the five alleged discrete acts of harassment that Akonji experienced - - the first four occurring within the first three months of her employment and the final act occurring more than a year later - - were isolated incidents not "sufficiently continuous and concerted" to be deemed pervasive. Carrero, 890 F.2d at 577 (quoted in Faragher, 524 U.S. at 787 n.1); see also Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Even a few isolated incidents of offensive conduct do not amount to actionable harassment."); Hopkins v. Baltimore Gas &

22

Electric Co., 77 F.3d 745, 753 (4th Cir. 1996) (concluding that incidents of sexual harassment that occurred intermittently over a seven-year period with gaps as much as one year in between were not sufficiently pervasive).  That the alleged harassment occurred on only a handful of occasions and only sporadically after March 2002 undercuts Akonji's contention that the conduct was sufficiently severe or pervasive to alter the terms and conditions of her employment.  See Harris, 510 U.S. at 23.  Indeed, although the Court is troubled by some of Akonji's allegations and in particular by the nature of the physical contact alleged, the facts that (1) well over a year passed between the early incidents involving touching and the most recent one, and that (2) Akonji ceased working at the same location as Nwokorie after only a few months, suffice to demonstrate that the instances of harassment were not severe or pervasive enough to alter the conditions of Akonji's employment and create an abusive working environment.  Because Akonji has not established a prima facie case of a hostile-work-environment claim, the Court will grant Unity's motion for summary judgment on that basis and need not address the existence of respondeat superior liability.

## **CONCLUSION**

For the foregoing reasons, the Court grants defendant Unity's motion for summary judgment as to all of plaintiff's claims.  A separate order has been posted on this date.

          /s/  John D. Bates
        JOHN D. BATES
      United States District Judge

Dated:   April 24, 2007